[Cite as *In re J.B.*, 2016-Ohio-5271.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | |
| | | CASE NOS. CA2016-01-012 |
| J.B. | : | CA2016-01-013 |
| | : | O P I N I O N |
| | | 8/5/2016 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2012-0652

Amy Renee Ashcraft, P.O. Box 172, Seven Mile, Ohio 45062, guardian ad litem (for child)

Christopher P. Frederick, 300 High Street, Suite 550, Hamilton, Ohio 45011, for appellant, J.B.

Auciello Law Firm, LLC, D. Joseph Auciello, Jr., 306 South Third Street, Hamilton, Ohio 45011, for appellant, H.S.

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Department of Job & Family Services

**HENDRICKSON, J.**

{¶ 1} Appellants, the biological mother and father of J.B., separately appeal from a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their son to appellee, the Butler County Department of Job and Family Services

("BCDJFS" or "the agency"). For the reasons set forth below, we affirm the juvenile court's decision.

{¶ 2} On December 21, 2012, BCDJFS filed an abuse and dependency complaint with the juvenile court seeking an order granting temporary custody of J.B., then four months old, to R.E. and W.E., the child's paternal aunt and uncle. The complaint alleged that on December 19, 2012, BCDJFS received reports of "drug abuse" and of physical abuse due to domestic violence between Mother and Father. The complaint also set forth that Mother and Father had been arrested for domestic violence on December 20, 2012.

{¶ 3} The juvenile court ordered the removal of J.B., placed him in the custody of his paternal aunt and uncle, and granted Mother and Father supervised visitation with the child. However, approximately one month later, BCDJFS filed an amended complaint seeking an order granting temporary custody of J.B. to the agency. In its amended complaint, BCDJFS repeated the allegations of abuse and dependency, as well as the facts related to the reported drug abuse and Mother's and Father's arrests for domestic violence.[1] On January 24, 2013, the juvenile court placed J.B. in BCDJFS's temporary custody and ordered that Mother and Father have continued supervised visitation.

{¶ 4} On August 14, 2013, the case proceeded to adjudication. At this time, BCDJFS withdrew the allegations of abuse, and Mother and Father stipulated to the allegations of dependency.[2] The juvenile court adjudicated J.B. dependent, continued temporary custody with the agency, and adopted a case plan for the parties. The case plan required that Mother

---

1. BCDJFS filed a second amended complaint on July 31, 2013, which continued to assert that J.B. was an abused and dependent child. The complaint again set forth the facts related to Mother's and Father's arrests for domestic violence and drug abuse, but also added allegations that Mother and Father had both accused the other of drug abuse.

2. In its complaint, the agency specified that J.B. was a dependent child as defined in R.C. 2151.04 as he "lack[ed] adequate parental care by reason of the mental or physical condition of [his] parents" and his "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

and Father, among other things, undergo mental health, substance abuse, and domestic violence assessments, complete any recommended services that resulted from these assessments, complete parenting education classes, submit to drug screens, and obtain and maintain employment and suitable housing.[3]

{¶ 5} Mother and Father made limited progress in meeting the goals of the case plan, and on August 6, 2014, BCDJFS filed a motion for permanent custody of J.B. A hearing on the permanent custody motion was held on January 30, 2015 and February 6, 2015, at which time the magistrate heard testimony from the agency's caseworker, two employees who supervised visitations between Father and J.B. at the Family Connections visitation center, foster mother, Mother, Father, and the nonrelative, legal custodian of Father's three other biological children.[4]

{¶ 6} The caseworker testified J.B. has been in the agency's custody since January 24, 2013, and he had been involved in J.B.'s case since September 13, 2013. The caseworker explained that neither Mother nor Father had made any significant progress on the case plan. Although Mother had completed several assessments, including a domestic violence victim assessment, a physiological assessment, and a substance abuse assessment, Mother had not completed the services that were recommended as a result of the assessments. Mother had not joined a victims' group or engaged in mental health treatment by regularly attending counseling sessions or obtaining psychiatric care.

{¶ 7} Mother did start treatment for her dependency on heroin. She completed a five-month residential treatment plan at Sojourner Recovery Services ("Sojourner") and was

---

3. The original case plan did not specify that Mother and Father needed to obtain and maintain employment and suitable housing. These requirements were added by the juvenile court throughout the pendency of the case when it became apparent that neither parent maintained steady employment or a permanent residence.

4. Father has three daughters from a previous relationship. The children are in the legal custody of their maternal grandmother.

placed in intensive outpatient treatment ("I.O.P.").  However, a short time after being placed in I.O.P., Mother tested positive for drugs.  She returned to Sojourner's residential treatment program, but left the program in mid-April 2014, against Sojourner's advice.  She had not obtained any other treatment for her drug dependency even though the caseworker had recommended two other programs to Mother.

**{¶ 8}**  The caseworker also testified Mother had not completed the recommended parenting classes or obtained stable employment or housing.  With respect to Mother's housing, the caseworker explained Mother had provided "multiple addresses" throughout the agency's involvement in the case.  One of the addresses had been provided to the caseworker on a number of occasions.   The caseworker attempted to visit Mother at this home "multiple times" but he never found Mother at this residence and he was unable to view the interior of the home.

**{¶ 9}**  As for Father's progression on the case plan, the caseworker testified that as of January 30, 2015, Father was "pretty much at the same point * * * he was when [the caseworker] got the case on 9/13 of 2013. * * * [Not] much of a change or progress."  Father had completed several assessments, including a batterer's assessment, a psychological assessment, and a substance abuse assessment.  As a result of these assessments, Father was ordered to participate in a psychiatric consult, outpatient substance abuse treatment, and counseling, which was to contain a component of corrective thinking.  Father did not participate in the psychiatric consultation but did attend some counseling sessions before terminating the counseling sessions because he believed his counselor was "crazy."  Father started his outpatient substance abuse treatment in early March 2014, but was discharged from the program on April 21, 2014, for failing to consistently attend the meetings. Father did not return or complete the program.

**{¶ 10}**  The caseworker testified that stability is a major concern with Father.  Although

Father reported he was working, Father had not provided the caseworker with copies of his paystubs or other proof of employment. Father also did not have a stable living arrangement. Father never provided the caseworker with a physical address and the caseworker was unable to view any residence where Father reportedly stayed. Father informed the caseworker in September 2014, that he was living in his car. At the permanent custody hearing, Father reported he had been living in an efficiency hotel for the past five weeks but the caseworker had not been provided with the address of the hotel and therefore was unable to view the hotel room.

{¶ 11} In addition to testifying about Mother's and Father's lack of progress on the case plan, the caseworker also testified about Mother's and Father's visitations with J.B. The caseworker explained that both Mother and Father are bonded with J.B. and both had exercised visitation with the child somewhat inconsistently. The caseworker noted that Mother's visitations with J.B. had been suspended early on in the case due to her substance abuse issues and lack of participation in services. After Mother entered residential treatment and passed three consecutive drug screenings, her visitations were reinstated. Mother's visitations, however, never progressed beyond "Level 1" observation, which required constant supervision by a Family Connections' employee. The caseworker observed that during Mother's visitations, she appeared to struggle to keep up with J.B.'s energetic nature and behavior.

{¶ 12} As for Father's visitations with J.B., the caseworker noted Father had missed "roughly fifty (50) percent of visitations." Father's visitations were suspended in August 2013, after Father made some statements that were perceived by BCDJFS to be threatening. His visitations were reinstated in November 2013, after he underwent a psychological assessment. Father's visitations with J.B. progressed from a "Level 1" observation, requiring constant supervision, to "Level 2" observation, which required an employee of Family

Connections to check in on the visitation every 15 minutes.

{¶ 13}   Two employees who supervised Father's visitations with J.B. at Family Connections also testified about the consistency of Father's visits.  One employee estimated Father only missed 20 to 30 percent of the visits that occurred between November 2013 to November 2014, the majority of which were missed due to transportation issues.  The other employee, who supervised Father's visits from November 24, 2014 to February 6, 2015, estimated Father had been present for 6 of 11 scheduled visits.  Both employees described Father and J.B.'s relationship as "very close" and "loving" and they testified Father and J.B. interacted appropriately with one another.  One employee did, however, testify that Father would sometimes become upset during the visitations when discussing BCDJFS's involvement in J.B.'s life.  Father often expressed his displeasure over J.B. being removed from his custody.  The Family Connections employee was always able to deescalate Father's anger so that the visitations could continue.

{¶ 14}   Foster mother testified at the hearing that J.B. has been placed in her home since November 14, 2013.  J.B. is closely bonded to his foster mother, foster father, their biological children, and the other two foster children in their care.  Foster mother stated J.B. is very happy and healthy in her care and she expressed a desire to adopt J.B. if the agency's permanent custody motion were granted by the juvenile court.

{¶ 15}   Mother testified at the hearing about her progress on the case plan.  Mother explained she had been using drugs "on and off" for approximately the last 18 months.  Mother stated heroin was her "drug of choice" but she also admitted to using marijuana and painkillers.  Mother stated she was receiving treatment for her drug dependency, and she discussed her unsuccessful attempt to complete residential treatment at Sojourner's a second time.  She explained that after leaving Sojourner's residential treatment program early, she was prohibited by the facility from reentering the program for six months.  Although

the caseworker recommended two other treatment facilities that Mother could obtain services from, Mother claimed she was unable to attend these facilities as the facilities did not accept her insurance.

{¶ 16}    Mother stated she was working towards obtaining stable income and housing. She recognized that she had provided BCDJFS with five different addresses throughout the pendency of the case, but claimed to have resided primarily at an address in Hamilton, Ohio with her father.  She also claimed she had been working at a factory in Middletown, Ohio for the past two months, but she could not recall the name of the business.  She did not present any paystubs or other means of employment verification at the hearing.

{¶ 17}    Mother testified she had completed all the assessments the agency asked her to complete.  Mother denied making statements during her assessments that Father "drank all the time" or that she suffered from nightmares because Father had "hit her in the past." On cross-examination, Mother testified Father "never" hit her.  She explained that although she and Father had been arrested for domestic violence in December 2012, neither of them were convicted of the offense.

{¶ 18}    Mother testified she loved her son but recognized that she was not in a position for J.B. to live with her "on a permanent basis."  She admitted she had not always visited J.B. "as often as [she] should have," and claimed transportation problems interfered with some of her visitations.

{¶ 19}    Father testified at the hearing that in addition to J.B. he has three other biological children.  These three children, J.B.'s half-sisters, do not reside with Father. Rather, they are in the legal custody of their maternal grandmother.  Father claimed to visit with these children nearly every weekend, sometimes in the home of the maternal grandmother and other times at the residence where he was staying.

{¶ 20}    With respect to his own residence, Father testified that after losing custody of

J.B. to the agency, he became depressed and eventually lost his home in March 2013. Father stayed at his stepmother's residence for a period of time, lived with a girlfriend "on and off" for eight months in Warren County, Ohio, stayed in his car for a brief period of time, and rented a "sleeping room" in a home in Hamilton, Ohio before moving into an efficiency hotel room at Intown Suites.[5] Father testified this hotel room has running water, heat, air conditioning, and a kitchenette where he can prepare food. Although Father admitted he does not really want his son living with him in a hotel room and would prefer to have an apartment for the child to live in, Father testified the efficiency room would provide J.B. with "everything he needs."

{¶ 21} Father explained the Intown Suites is located near the furniture store where he has worked for the past year. Father stated he received two promotions and currently delivers furniture for the store. Father testified his current employment makes it difficult to attend all the services and classes BCDJFS wants him to take. Father denied that some of the services recommended by the agency were necessary or helpful. He claimed he did not have a drug or alcohol problem, and testified that the agency only required him to take substance abuse classes so that the various organizations the agency is facilitated with could make money.

{¶ 22} Father explained that although he and Mother were arrested for domestic violence in December 2012, neither of them were convicted of the offense. Father admitted to having previous convictions for domestic violence, assault, resisting arrest, and aggravated menacing. Father denied, however, that J.B. was ever assaulted or injured while in his care. He also denied making threats to murder an agency worker in August 2013, if he did not reobtain custody of his son.

---

5. Father explained that at the home where he rented a "sleeping room" he shared a kitchen and bathroom with other tenants, but had his own, private bedroom which he could lock.

{¶ 23}  Father testified he is closely bonded with his son and enjoys spending time with J.B.  He denied missing "roughly 50 percent" of his scheduled visitations and explained that the majority of the visitations he did miss occurred because he had transportation issues.  According to Father, a few vehicles he owned throughout the pendency of the case suffered mechanical problems shortly after he purchased them.  Father explained his need to obtain reliable transportation prevented him from saving money to apply towards a suitable apartment for him and J.B.

{¶ 24}  The legal custodian of Father's three daughters testified at the hearing on Father's behalf.  She stated she has known Father for approximately nine years and Father "used to" have a "real bad temper" and "drink real bad."  However, she believed Father was doing much better and she allowed Father visitation with his daughters.

{¶ 25}  After hearing the foregoing testimony and accepting the various case summaries, assessments, and reports submitted by the agency into evidence, as well as the guardian ad litem's report recommending that permanent custody of J.B. be granted to the agency, the magistrate took the matter under advisement.  On February 11, 2015, the magistrate determined it was in J.B.'s best interest to continue the adjudication in progress. The magistrate advised Mother and Father that they were receiving an additional five months to engage in case services.  Mother and Father were instructed to communicate regularly with the caseworker, Father was ordered to undergo a new substance abuse assessment and a new batterer's assessment, and Mother was ordered to undergo an assessment by the Board of Developmental Disabilities.

{¶ 26}  On July 1, 2015 and July 8, 2015, the magistrate reconvened the permanent custody hearing and heard testimony from the caseworker, Mother, and Father.  The caseworker testified that since the last hearing, Mother had a brief hospitalization in a psychiatric hospital.  Once released, she returned to Sojourner's and completed the facility's

residential treatment program on May 29, 2015. As of July 8, 2015, Mother was attending an I.O.P program. Mother had not obtained an assessment from the Board of Developmental Disabilities, but she had begun a program for victims of domestic violence. On Mother's own initiative, she completed a parenting class at Catholic Charities, but she had only just begun a hands-on parenting class through the Development of Living Skills program, which was required by her case plan. Mother had not reported any employment to the caseworker, but did report that she was again residing with her father in Hamilton, Ohio. The caseworker observed that Mother's visits with J.B. had gone "well" since the February 11, 2015 hearing.

{¶ 27} With respect to Father's progress with the case plan, the caseworker noted that Father had waited until June 28 or 29, 2015, to complete a new substance abuse assessment and batterer's assessment. He had not completed any of the recommended treatment plans or services that resulted from such assessments. Although Father was supposed to start an anger management program on July 1, 2015, he did not attend the session because he had to work. He also had not engaged in the recommended Development of Living Skills parenting program. Although Father had briefly resumed mental health counseling after the February 11, 2015 hearing, he discontinued counseling in the beginning of March 2015, against his counselor's recommendation. Father also failed a drug test in June 2015, after testing positive for Benzodiazepines.

{¶ 28} The caseworker testified Father had not obtained an apartment, but continued to reside in a hotel. The caseworker was unable to view the room to determine if it was suitable for J.B. When the caseworker asked to view room, he was advised by Father that the room was not appropriate. The caseworker noted that Father's visitations with J.B. had become more consistent since February 2015, with Father only missing two visitations. However, the caseworker testified that Father's communication with the agency had not improved. The only time Father communicated with the caseworker was when the

caseworker attended Father's visitations or, on one occasion, when Father encountered the caseworker at a local restaurant.

{¶ 29} Mother testified that she was currently six months pregnant, was unemployed with no source of income, and was residing in her father's home in Hamilton, Ohio. Mother testified she had recently completed a residential treatment program at Sojourner's, and was starting an I.O.P. program. Mother acknowledged that in May 2015, she had relapsed using cocaine. Mother also acknowledged she had been hospitalized for mental health issues in May 2015, claiming the hospitalization occurred so that her medication could be regulated. Mother testified that while she is currently taking the drug Subutex as part of her I.O.P. program, she is not taking any psychiatric medication due to her pregnancy. Mother stated she is continuing to make strides towards completing the case plan, having started the recommended Development of Living Skills parenting program after voluntarily completing another parenting class with Catholic Charities.

{¶ 30} Father testified that he was still employed with the furniture store and he brought paystubs as proof of employment. Father explained that he had not obtained an apartment since the February 2015 hearing because he had to buy a new car after his last vehicle broke down. Father did, however, move into a less expensive extended-stay hotel. Father testified the Budget Inn in Fairfield, Ohio where he was staying would be appropriate for J.B. as there was electricity, running water, a kitchen, and two beds.

{¶ 31} Father testified that he had not started the Development of Living Skills parenting class because he did not recall being told to take the parenting class. He also admitted to missing the majority of his counseling sessions, but blamed his transportation problems for his failure to attend. Father also testified about his failed drug test, explaining that he had tested positive for Benzodiazepines after taking a family member's Valium pill. According to Father, he was having a panic attack and took the Valium pill to relax and calm

down.  Father stated he had not sought treatment for his panic attacks.

{¶ 32}  After hearing the foregoing testimony and considering the exhibits that were entered into evidence, including the updated assessments, case summaries, and guardian ad litem's report recommending permanent custody to BCDJFS, the magistrate granted the agency's motion.  Mother and Father filed objections to the decision, which were overruled by the juvenile court.  On December 17, 2015, the juvenile court adopted the magistrate's decision awarding BCDJFS permanent custody of J.B.

{¶ 33}  Mother and Father timely appealed the juvenile court's decision, each raising a single assignment of error.  For ease of discussion, we shall address their arguments together.

{¶ 34}  Mother's sole assignment of error:

{¶ 35}  THE TRIAL COURT ERRED BY FINDING CLEAR AND CONVINCING EVIDENCE TO SUPPORT TRANSFER OF PERMANENT CUSTODY TO CHILDREN'S SERVICES FINDING THE FACTORS OF R.C. 2151.414(B) & (D) PRESENT.

{¶ 36}  Father's sole assignment of error:

{¶ 37}  THE TRIAL COURT ERRED BY FINDING CLEAR AND CONVINCING EVIDENCE TO SUPPORT TRANSFER OF PERMANENT CUSTODY TO BUTLER COUNTY CHILDREN'S SERVICES FINDING THE FACTORS OF R.C. 2151.414(B) & (D) PRESENT.

{¶ 38}  In their respective assignments of error, Mother and Father argue the juvenile court's decision to grant BCDJFS permanent custody was not supported by clear and convincing evidence and was against the manifest weight of the evidence.  Mother and Father argue the juvenile court failed to thoroughly examine the evidence presented to determine the child's best interests using the factors listed in R.C. 2151.414(D)(1)(a)-(e).  They further contend that the record does not support the court's finding that J.B. could not be placed with either parent within a reasonable time because Mother and Father did not

complete case plan services and failed to remedy the problems that initially caused J.B. to be placed outside the home. We disagree with Mother's and Father's arguments and find no error in the juvenile court's decision to award BCDJFS permanent custody of J.B.

{¶ 39} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). Clear and convincing evidence is that which will produce in the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St.3d 469, 477 (1954). "A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented." *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 22, citing *In re Rodgers*, 138 Ohio App.3d 510, 520 (12th Dist.2000).

{¶ 40} Even if a juvenile court's judgment is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19. In determining whether a decision is against the manifest weight of the evidence, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re S.M.,* 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 10; *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and

CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. As a result, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

{¶ 41} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. "Only one of those findings must be met for the second prong of the permanent custody test to be satisfied." *In re A.S.*, 12th Dist. Warren Nos. CA2015-12-112 and CA2015-12-113, 2016-Ohio-1580, ¶ 17.

{¶ 42} The juvenile court found by clear and convincing evidence, and Mother and Father do not dispute, that J.B. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. However, Mother and Father do dispute the juvenile court's

finding that granting permanent custody of J.B. to BCDJFS is in the child's best interest.[6]

{¶ 43} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} In awarding BCDJFS permanent custody, the juvenile court considered the best interest factors in light of the evidence presented at the hearings. With respect to R.C. 2151.414(D)(1)(a), the juvenile court found that Mother had developed a bond with J.B., but had, at times, struggled to keep up with his activity levels during visits. The court also found Mother had not visited as often as she could have and noted that Mother's visitations were suspended for some time due to her substance abuse issues and lack of participation in case

---

6. We recognize that both the caption of Mother's assigned error and Father's assigned error indicate that the parties are challenging the juvenile court's finding with respect to R.C. 2151.414(B). However, in their appellate briefs, Mother and Father both concede that there was clear and convincing evidence that J.B. had been in BCDJFS's care for 16 months of a consecutive 22-month period. The focus of our analysis, therefore, is on whether BCDJFS presented clear and convincing evidence that permanent custody is in the best interest of J.B. pursuant to the factors set forth in R.C. 2151.414(D).

- 15 -

services.

{¶ 45} With respect to Father's relationship with J.B., the court concluded that "Father is very bonded" with J.B., the "child is comfortable with Father, Father interacts appropriately and the child often cries when separating from Father at the end of the visits." However, the court noted Father had "some issues with attendance for much of the case" and his visitations were not always consistent. Further, during the visitations, Father frequently "appeared to verbally express anger about the child's removal * * * in front of the child," which required the employee supervising Father's visitations to get involved in order to deescalate Father's anger. The court also noted that Father's visitations had been suspended for a few months in 2013 after Father made some statements "which were perceived by BCDJFS as threats * * * against the social worker."

{¶ 46} The court determined J.B. had been placed in his current foster home in November 14, 2013, he is "strongly bonded" to his foster parents, and he is well cared for in his foster home. The court noted J.B. is an "active member of [his foster] household" and foster mother desires to adopt J.B. if permanent custody were granted to the agency.

{¶ 47} In its consideration of R.C. 2151.414(D)(1)(b), the juvenile court indicated it had not conducted an in camera review of J.B., but the guardian ad litem had recommended the court grant permanent custody to the agency.

{¶ 48} As for R.C. 2151.414(D)(1)(c), the juvenile court found J.B. had first been placed in his paternal aunt and uncle's care on December 21, 2012, before being placed in BCDJFS's temporary custody on January 24, 2013. The court noted J.B. had remained in BCDJFS's custody since that time, and that the child had therefore been in the agency's custody for 12 or more months of a consecutive 22-month period.

{¶ 49} With respect to R.C. 2151.414(D)(1)(d), the juvenile court found J.B. is in need of a legally secure permanent placement and the child's need for a legally secure permanent

placement cannot be obtained without a grant of permanent custody to the agency. In reaching this determination, the juvenile court considered Mother's and Father's progress since the case initiated and the case plan was adopted by the court in August 2013, as well as J.B.'s progress in the foster home where he has resided for nearly his entire life. The court noted J.B. had been residing in foster care for approximately 29 months while the case was pending, and during this time, neither Mother nor Father had completed the services set forth in the case plan.

{¶ 50} With respect to Mother, although she underwent several assessments, the court found she had not completed the required Development of Living Skills parenting program or a program for domestic violence victims and she had failed to obtain consistent mental health treatment. The court noted Mother had "attempt[ed] to assign blame to the agency for not making timely referrals for all of the services that she was ordered to participate in." However, the court found clear evidence that "Mother's ongoing substance abuse issues made treatment a priority and until she was able to successfully treat her addictions, she was unlikely to benefit from the other services."

{¶ 51} As for Mother's ongoing substance abuse issues, the court noted Mother has twice completed residential treatment for her heroin addiction but has a history of relapsing on illegal substances. Mother admitted to the court she relapsed on marijuana in January 2015, and on cocaine in May 2015. At the time of her May 2015 relapse, Mother was pregnant with her second child. Also in May 2015, Mother was hospitalized for mental health issues—an issue the juvenile court found mother to be "extremely cagey about."

{¶ 52} In addition to Mother's ongoing substance abuse issues, the juvenile court also expressed concern about Mother's ability to support and care for J.B. by maintaining stable housing and employment. The juvenile court found Mother had no source of income and was reportedly residing in her father's home in Hamilton, Ohio. However, as the court noted,

- 17 -

Mother "has told the BCDJFS worker at different times throughout the case that she was residing there, but the worker has never been able to visit her at that residence or any other residence."

**{¶ 53}** The court had similar concerns about Father's ability to provide permanent care for J.B. The court found Father had demonstrated an ability to maintain stable employment, but noted that "despite having that income [from his employment], [Father] has never managed to obtain suitable housing, and has been either homeless or residing in unsuitable residences or hotels or staying with friends or family throughout this case." The court discussed Father's failure to communicate with BCDJFS and noted that the caseworker had never been able to view a residence in which Father claimed to reside in order to determine its suitability for J.B.

**{¶ 54}** The court also found Father "has been reluctant to participate in services and slow to engage and thus * * * failed to complete any services." Although Father underwent a variety of assessments, some of which he waited to complete until just a few days before the permanent custody hearing reconvened on July 1, 2015, Father did not complete the services that were recommended as a result of the assessments. Father had not completed a psychiatric consult, an outpatient substance abuse program, or the Development of Living Skills parenting program. Father also had not regularly attended counseling sessions as required by the case plan. As the court noted, "Father * * * appears genuinely convinced that he is not truly in need of these services" and expressed his belief that he was required to complete the services only so that "the professionals * * * [could] receive money for providing those services." However, the court found, and we agree, that there was no credible evidence presented to support Father's theory. As the juvenile court noted, "those individuals in need of services are often the last to recognize their own need for treatment" and "the assessments conducted on Father are the best evidence of Father's current issues and his

need for services."

{¶ 55} With respect to Father's belief that he did not need to participate in substance abuse services, the court found "Father has a history of alcohol abuse, and an extensive criminal history which relates, in part, to that substance abuse history." The court noted Father's own witness, the legal custodian of his three daughters, testified Father "used to drink real bad" and had "a real bad temper." Further, Father tested positive for Benzodiazepines in June 2015, and admitted to taking another's prescription Valium in order to self-medicate a panic attack. The court was concerned by Father's actions, stating that Father "continue[d] to have untreated mental health related issues that he is now addressing by taking other people's prescription medications, rather than obtaining appropriate medical treatment for his issues."

{¶ 56} Given the evidence presented at the permanent custody hearings, we find that there was sufficient, credible evidence presented that J.B. was in need of legally secure permanent placement and that such placement could not be obtained without a grant of custody to the agency. J.B. had been in the agency's custody since January 24, 2013, and Mother and Father had not progressed on the case plan despite being given an extra five months to complete case services. No relatives of J.B. had filed a motion seeking custody of the child and there were no other persons available to parent the child. J.B. was bonded to his foster parents and his foster mother had expressed an interest in adoption if that became an option for J.B.

{¶ 57} The foregoing considerations strongly weigh in favor of the juvenile court's decision to award BCDJFS permanent custody of J.B. Although there was evidence demonstrating J.B. is bonded with Mother and Father, the remaining considerations set forth in R.C. 2151.414(D)(1) establish that it is in J.B.'s best interest for BCDJFS to be awarded permanent custody.

**{¶ 58}** In reaching this determination, we find no merit to Mother's and Father's contentions that reasonable efforts were not made to reunify them with J.B. or that "case plan services addressed concerns far beyond what was required." Although Mother and Father argue they substantially remedied the conditions that caused J.B. to be placed outside their care, the record demonstrates otherwise. The fact that the agency dismissed allegations of abuse from its complaint and the domestic violence criminal charges Mother and Father faced as a result of the December 2012 incident were dismissed by the state does not mean that the case plan requiring Mother and Father to complete services related to domestic violence concerns were inappropriate or, as Mother contends, "unnecessary roadblocks."

**{¶ 59}** Clear and convincing evidence was presented to support the juvenile court's determination that neither Mother nor Father successfully completed services or made the necessary changes in their lives to address the concerns that led to the removal of J.B. Mother and Father admitted the allegations of dependency set forth by the agency in its complaint. Mother and Father were made aware of the requirements of the case plan when they signed the case plan in February 2013, and when the case plan was made an order of the court in August 2013. At the time the court adopted the plan as an order of the court, neither Mother nor Father objected to any of the case plan services. Further, as the case plan developed over the course of the case, which spanned well over two years, Mother and Father never took the opportunity to raise concerns with the requirements of the case plan. Instead, Mother and Father "remained in denial of any issues that they have to correct, and thus, * * * done little to attempt to address the concerns in any timely fashion."

**{¶ 60}** Although Mother and Father both underwent assessments for psychological, domestic violence, and substance abuse issues, neither one of them completed the necessary services that were recommended as a result of these assessments. With respect to the domestic violence services, Mother made statements during her assessment that she

had been the victim of domestic violence. Although her recollection of domestic violence incidents between herself and Father had faded at the time of the permanent custody hearings, the court found that Mother was in need of "address[ing] concerns about her being a victim of domestic violence." We find no error in the court's determination that Mother needed to come to terms and address the role domestic violence had played in her life.

**{¶ 61}** Similarly, although Father did not believe he needed to engage in services for domestic violence, the record shows Mother had previously made statements that Father had "hit her in the past" and Father had multiple prior convictions for domestic violence. Father had also completed two batterer's assessments, and both assessments resulted in recommended treatment and intervention for domestic violence. We therefore find more than sufficient evidence to support the appropriateness of the case plan requirement that Father and Mother complete domestic violence related services.

**{¶ 62}** We further find, contrary to Father's arguments on appeal, that the required case plan services for Father's substance abuse issues were appropriate. Although Father claims he has "no history" of drug abuse or alcohol dependency, the record reveals Father "used to drink real bad" and have a "real bad temper." Additionally, although Father did not routinely fail the drug tests that were administered throughout the case, Father did fail a drug test in June 2015, after taking another's prescription medication. Father also completed two substance abuse assessments, and both assessments resulted in the recommendation that Father complete outpatient substance abuse treatment programs. Given this evidence, we find the requirement that Father undergo substance abuse treatment appropriate and related to the goal of reunification.

**{¶ 63}** We also find that the juvenile court did not err in considering Mother's and Father's decisions not to complete or even pursue the necessary treatment options related to the case plan adopted by the court. "Noncompliance with a case plan is a consideration for

the termination of parental rights." *In re N.R.*, 12th Dist. Butler No. CA2007-12-314, 2008-Ohio-1993, ¶ 35, citing *In re Brofford*, 83 Ohio App.3d 869, 878 (10th Dist.1992). Mother's and Father's failure to participate in case plan services was a relevant consideration in the court's determination that Mother and Father had not substantially remedied the conditions that caused J.B. to be removed from their home and its determination that J.B. could not and should not be placed with either parent within a reasonable amount of time.

{¶ 64} Accordingly, in light of the foregoing, and after carefully reviewing the record in this case, we find the juvenile court's findings are supported by sufficient, credible evidence and are otherwise not against the manifest weight of the evidence. The juvenile court did not err in finding it was in J.B.'s best interest to be placed in the permanent custody of BCDJFS. Mother's assignment of error and Father's assignment of error are, therefore, overruled.

{¶ 65} Judgment affirmed.

PIPER, P.J. and S. POWELL, J., concur.